UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

————————————————————————————— X

JOHN COOK                                    :

                                             :

            Plaintiff,                       : No. 11 Civ. 8624 (BSJ)

            v.                               : ECF Case

NATIONAL ARCHIVES AND RECORDS
ADMINISTRATION,                              :

                                             :

            Defendant.                       :

————————————————————————————— X


**MEMORANDUM OF LAW OF PLAINTIFF JOHN COOK
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND
IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL AND PROCEDURAL BACKGROUND................................................. 2

    1.  The Presidential Records Act.................................................................. 2

    2.  The FOIA Request ................................................................................. 4

    3.  NARA's Response to Mr. Cook's FOIA Request ................................... 4

    4.  Mr. Cook's Administrative Appeal........................................................ 5

    5.  The Current Litigation ........................................................................... 5

STANDARD OF REVIEW ................................................................................... 5

ARGUMENT ......................................................................................................... 6

I.   NARA BEARS A HEAVY BURDEN UNDER FOIA EXEMPTION 6 TO JUSTIFY WITHHOLDING THE RECORDS........................................................ 6

   A.  FOIA Mandates a Strong Presumption of Access to Government Records .................. 6

   B.  Exemption 6 Is Particularly Narrow........................................................ 7

II.   NARA HAS FAILED TO CARRY ITS BURDEN UNDER EXEMPTION 6.................. 9

   A.  Records of special access requests are not personnel, medical, or similar files and therefore are not exempt from FOIA disclosure requirements. ............................................. 9

   B.  There is No Substantial Privacy Interest in the Special Access Requests of the Former Officials or Their Representatives .................................................. 11

     1.  The Former Officials' Designees Have No More Than a *De Minimis* Privacy Interest in Their Requests .......................................................... 11

     2.  NARA Mischaracterizes Congress's Limited Concern for the Privacy of Former Presidents and Vice Presidents. .................................................... 12

     3.  There Is At Most a *De Minimis* Privacy Interest in the Research Requests Made by Former Officials to a Federal Agency for Public Documents ......................................... 15

     4.  There Is No Substantial Privacy Interest In the Special Access Requests Even If the Former Officials Are Considered Private Citizens. ............................................. 16

5.  Disclosure Would Accord with Congress's Policy Choices ............................ 19

C.  Any Privacy Interest Is Outweighed by the Legitimate Public Interest in Understanding NARA's Implementation of the PRA .......................................................................... 20

CONCLUSION ............................................................................................................ 25

## TABLE OF AUTHORITIES

### Cases

*Aguirre v. S.E.C.*, 551 F. Supp. 2d 33 (D.D.C. 2008) .............................................. 8, 11

*Al-Fayed v. CIA*, 254 F.3d 300 (D.C. Cir. 2001) ......................................................... 6

*American Fed'n of Gov't Employees, Local 1760 v. Fed. Labor Relations Auth.*, 786 F.2d 554 (2d Cir. 1986) ................................................................................................................ 13

*American Historical Ass'n v. Peterson*, 876 F. Supp. 1300 (D.D.C. 1995) ....................... 3

*Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274 (2d Cir. 2009) ................ 11, 23, 24

*Baltimore Sun v. U.S. Marshals Serv.*, 131 F. Supp. 2d 725 (D. Md. 2001) ..................... 22

*Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143 (2d Cir. 2010) ........... 6

*Brown v. Fed. Bureau of Investigation*, 658 F. 2d 71 (2d Cir. 1981) .............................. 13

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Homeland Sec.*, 527 F. Supp. 2d 76, 99 (D.D.C. 2007) ............................................................................................... 1

*Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, CIV.A. 11-1021 JEB, 2012 WL 692048 (D.D.C. Mar. 2, 2012) ............................................................... 23

*Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) .............................. 7, 17, 21

*Ditlow v. Shultz*, 517 F.2d 166 (D.C. Cir. 1975) ...................................................... 7, 9

*EPA v. Mink*, 410 U.S. 73 (1973) ............................................................................ 7

*Families for Freedom v. U.S. Customs & Border Prot.*, 10 CIV. 2705 (SAS), 2011 WL 6780896 (S.D.N.Y. Dec. 27, 2011) ................................................................... 8, 9, 10, 11

*FLRA v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503 (2d Cir. 1992) ....................... 12, 22

*Grand Central P'ship, Inc. v. Cuomo*, 166 F.3d 473 (2d Cir. 1999) .............................. 7

*Greentree v. U.S. Customs Serv.*, 674 F.2d 74 (D.C. Cir. 1982) .................................. 19

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) .......................................................... 7

*Hertzberg v. Veneman*, 273 F. Supp. 2d 67 (D.D.C 2003) .......................................... 24

*Hopkins v. U.S. Dep't of Hous. and Urban Dev.*, 929 F.2d 81 (2d Cir. 1991) ................ 21

*Miami Herald Pub. Co. v. U.S. Small Bus. Admin.*, 670 F.2d 610 (5th Cir. 1982) ......... 18

*Multi AG Media v. Department of Agriculture*, 515 F.3d 1224 (D.C. Cir. 2008) ............ 21

*Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency*, 811 F. Supp. 2d 713 (S.D.N.Y. 2011) ................................................................... passim

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157 (2004) ................................ 8

*Nat'l Inst. Of Military Justice v. United States Dep't of Def.*, 512 F.3d 677 (D.C. Cir. 2008) ........... 16

*National Ass'n of Retired Federal Employees v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) ............ 23

*News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173 (11th Cir. 2007) ................ passim

*Nixon v. Adm'r of Gen. Services*, 433 U.S. 425 (1977) ........................................... 14, 15

*People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284 (D.D.C. 2007) .............. 12

*Public Citizen, Inc. v. Dep't of Justice*, 111 F.3d 168 (D.C. Cir. 1997) ............................................ 16

*Ripskis v. Dep't of Hous. & Urban Dev.*, 746 F.2d 1 (D.C. Cir. 1984) .............................................. 8

*Rose v. Dep't of the Air Force*, 495 F.2d 261 (2d Cir. 1974), aff'd, 425 U.S. 352 (1976) ............... 6

*Ruotolo v. Dep't of Justice, Tax Div.*, 53 F.3d 4 (2d Cir. 1995) ........................................................ 6

*Sims v. CIA*, 642 F.2d 562 (D.C. Cir. 1980) ...................................................................................... 19

*U.S. Dep't of Defense v. FLR*, 510 U.S. 487 (1994) ......................................................................... 21

*U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (1989)... 3, 21, 22, 23

*U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136 (1989) ............................................................... 7

*U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) ......................................................................... 8, 17

*U.S. Dep't of State v. Washington Post Co.*, 456 U.S. 595 (1982) .............................................. 10, 11

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ......................................................................... 6, 7

*VoteHemp, Inc. v. Drug Enforcement Admin.*, 567 F. Supp. 2d 1 (D.D.C. 2004) ........................... 11

*War Babes v. Wilson*, 770 F. Supp. 1 (D.D.C. 1990) ....................................................................... 19

*Wilner v. Nat'l Sec. Agency*, 592 F.3d 60 (2d Cir. 2009) .................................................................. 6

*Wood v. F.B.I.*, 432 F.3d 78 (2d Cir. 2005) ...................................................................... 7, 8, 9, 12

**Statutes and Regulations**

44 U.S.C. § 2202 ......................................................................................................................... 3, 17

44 U.S.C. § 2203(f)(1) ........................................................................................................................ 3

44 U.S.C. § 2204 ......................................................................................................................... 4, 15

44 U.S.C. § 2205 ................................................................................................................................ 4

5 U.S.C. § 552(a)(4)(B) ..................................................................................................................... 6

5 U.S.C. § 552(b)(6) ................................................................................................................. passim

5 U.S.C. § 552(b)(7)(c) ...................................................................................................................... 8

Former Presidents Act, 3 U.S.C. § 102 ............................................................................................ 16

OMB Circular A-110, *Uniform Administrative Requirements for Grants and Agreements With Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations*, § 36(d)(1) (Sep. 30, 1999) ........................................................................................................................... 17

Presidential Records Act, 44 U.S.C. §§ 2201-07 .......................................................................... 3, 13

Privacy Act of 1974, 5 U.S.C. § 552(a) ........................................................................................... 19

**Congressional Reports and Hearings**

H.R. REP. NO. 95-1487 (1978), *reprinted in* 1978 U.S.C.C.A.N 5732. ............................... 13, 14, 15

S. Rep. No. 813, 89th Cong., 1st Sess. (1965) ................................................................................. 17

*The Disposition and Preservation of Documents of Federal Officials: Hearing on H.R. 16902 and Related Legislation Before the Subcomm. on Printing of the H. Comm. on H. Admin.*, 93rd Cong. (1974) ........................................................................................................................... 13, 20

*To Amend the Freedom of Info. Act to Insure Public Access to the Official Papers of the President, and for Other Purposes: Hearing on H.R. 10998 Before the Subcomm. On Gov't Information and Individual Rights of the H. Comm. on Gov't Operations*, 95th Cong. (1978) ...................... 14, 15

# PRELIMINARY STATEMENT

This action arises from a request journalist John Cook made to the National Archives and Records Administration (NARA) under the Freedom of Information Act (FOIA). Mr. Cook seeks records of requests made by President George W. Bush, Vice President Dick Cheney, and their designated representatives for special access to documents held by the Bush Presidential Library and NARA, as well as correspondence concerning those requests. Mr. Cook has *not* requested the underlying "Presidential records"—meeting minutes or policy memoranda, for example—which are protected from disclosure by the Presidential Records Act (PRA). Instead, Mr. Cook seeks information that is not protected by the PRA: the names of those who sought access, their requests, and correspondence concerning those requests. Their release will shed light on how NARA is administering the PRA, and it will serve to inform the public of how the former officials are using the agency and its processes to shape their own legacy.

Mr. Cook is entitled to inspect these documents because no FOIA exemption applies. The Government relies exclusively on Exemption 6, which prevents disclosure where disclosure "would constitute a clearly unwarranted invasion of personal privacy," 5 U.S.C. § 552(b)(6) (2006), but no plausible reading of Exemption 6 would allow NARA to withhold the names of the persons the former officials designated to receive special access to Presidential records.

Nor does Exemption 6 support NARA's decision to withhold the requests those special designees have submitted. To justify withholding documents under Exemption 6, NARA must show that the information sought is "similar" to the type of private information in medical and personnel files and that disclosure would result in "a clearly unwarranted invasion of personal privacy." It fails to make either showing. First, the information in a request for Presidential records is a mundane communication with a governmental agent and not anything like the intensely personal information

contained in medical and personnel files. Second, even if Exemption 6 applied, the privacy interest is insubstantial at best, and disclosure will directly shed light on NARA's implementation of the PRA. The information thus falls squarely within FOIA's core purpose.

The text and history of the PRA do not call that conclusion into question. Congress enacted the PRA to terminate the tradition of private ownership of presidential and vice presidential papers and to ensure that the public would have access to those records. The statute gives NARA custody of the documents and the responsibility to provide access to the public, subject to limitations inapplicable here. Notwithstanding NARA's asserted norms, policies, and general customs, FOIA (and in particular the fundamental rule that all records are subject to disclosure unless an exemption is available) applies with full force to documents covered by the PRA.

Moreover, the public interest in the information Mr. Cook seeks is substantial. A longtime journalist who currently writes for Gawker.com, Mr. Cook has asked for access to these records in part to help the public understand how NARA is performing its statutory duty under the PRA and, more specifically, how the agency is assisting the former officials to shape their legacy. "Shed[ding] light on an agency's performance of its statutory duties falls squarely within th[e] statutory purpose" of FOIA, *U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989), and any privacy concerns implicated by disclosure of the requests are negligible and far outweighed by the public interest. Congress made a judgment in enacting FOIA that the activity of our government should be open to public scrutiny. NARA is not exempt from that mandate, and the only FOIA exemption invoked does not apply.

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. The Presidential Records Act

The Presidential Records Act, 44 U.S.C. §§ 2201-07 (2006), evinces strong congressional

support for government transparency. The PRA generally makes records created during a presidential administration available to the public soon after the president leaves office. It "terminate[d] the tradition of private ownership of Presidential papers and the reliance on volunteerism to determine the fate of their disposition." *American Historical Ass'n v. Peterson*, 876 F. Supp. 1300, 1306 (D.D.C. 1995). The PRA defines two classes of documents: "Presidential records" and "Personal Records." Presidential records are those related to the President's time in office; they become the property of the United States when the President leaves office, and they are subject to the access regulations of the PRA. By contrast, personal records, not at issue here, are private to the President and do not become government property.

The PRA expressly declares that "[t]he United States shall reserve and retain complete ownership, possession, and control of Presidential records." 44 U.S.C. § 2202. The Act confers on the Archivist of the United States (the chief official overseeing NARA's operation) "responsibility for the custody, control, and preservation of, and access to, the Presidential records" generated during an outgoing president's term or terms. 44 U.S.C. § 2203(f)(1). It also gives the Archivist "an affirmative duty to make such [Presidential] records available to the public as rapidly and completely as possible consistent with the provisions of this Act." *Id.*

The only restrictions the PRA places on public access to the records at issue here are (1) a five-year period during which files from an administration's time in office are made available only for administrative archival purposes and (2) a period of up to 12 years during which access is restricted for documents in six enumerated categories if so designated by the President before leaving office. 44 U.S.C. § 2204. During those periods, former officials are allowed access to the documents, and they may grant early access to their "designated representatives." *Id.* The incumbent President, the judiciary, and Members of Congress are also granted early access when such access is

necessary for government business. 44 U.S.C. § 2205. Anyone who wishes to view the records of the former administration must submit a special access request, which necessarily contains the name of the requester and the substance of the request. Robison Decl. ¶ 15. NARA maintains both the Presidential records and documentation of requests for special access.

## 2. The FOIA Request

John Cook, a journalist who writes for Gawker Media, submitted a FOIA request to NARA on October 21, 2010. The request sought access to the agency's documentation of "all requests for access to records received by the George W. Bush Presidential Library since February 1, 2009," "all requests for access to the records of former Vice President Dick Cheney received by NARA staff since February 1, 2009," and all correspondence regarding those requests. Mr. Cook did not request access to the Presidential records themselves; he simply sought NARA's documentation of requests for access to those records. *See* Cook Decl.

## 3. NARA's Response to Mr. Cook's FOIA Request

NARA responded to Mr. Cook's request on December 1, 2010. It distinguished public FOIA requests for access to Bush-Cheney Presidential records from the "special access requests" made by former-President Bush and former-Vice President Cheney, the individuals they designated, the current Administration, Congress, and the courts. Although NARA agreed to disclose information related to the FOIA requests made by members of the public, its chose to withhold the special access requests, arguing that NARA traditionally treats those requests as "researcher reference requests" and withholds them under FOIA Exemption 6, 5 U.S.C. § 552(b)(6) (relating to information the disclosure of which would "constitute a clearly unwarranted invasion of personal privacy"). Compl. Ex. 2. On the other hand, NARA claimed the requests for the *same exact records* made by members of the public under FOIA do *not* fall under the protection of Exemption 6,

because "FOIA requesters are not subject to the same right to privacy" as researchers. Compl. Ex. 2.

### 4. Mr. Cook's Administrative Appeal

Mr. Cook appealed NARA's decision to withhold the documents he requested. In a follow-up letter dated June 3, 2011, NARA retracted its prior decision as to the requests made as part of the judicial process, as well as those made by the incumbent President or Members of Congress, stating that Mr. Cook was entitled to those documents.[1] The agency found no reason to withhold those documents under FOIA as it asserted no privacy interest in the requests by other government officials. But it maintained its position that the *former* officials' requests for records from their own Administration are categorically protected under FOIA.

Initially, NARA estimated that Exemption 6 covered 10,000 pages of documentation in its possession but later decreased that estimate to an unspecified "lower number." Answer ¶ 29.

### 5. The Current Litigation

Mr. Cook's Complaint was filed on November 29, 2011. By stipulation approved on March 23, 2012 (Dkt. No. 6), the parties agreed that Mr. Cook's FOIA request for purposes of this litigation would be narrowed to apply solely to (1) special access requests to NARA by former President Bush, former Vice President Cheney, and their designated representatives, and (2) NARA's responses to such persons. *See* Stip. ¶ 5.

### STANDARD OF REVIEW

Under FOIA, a court must undertake *de novo* review of an agency's decision to withhold information from the public. 5 U.S.C. § 552(a)(4)(B); *see also Bloomberg, L.P. v. Bd. of Governors of the Fed. Reserve Sys.*, 601 F.3d 143, 147 (2d Cir. 2010) (the court's review is conducted without deference to the agency's initial determination); *Al-Fayed v. CIA*, 254 F.3d 300, 306-07 (D.C. Cir.

---

[1] *See* Compl. Ex. 5. NARA has failed to provide these documents to Mr. Cook despite confirming receipt of his payment for the files. *See* Compl. Ex. 6; Cook Decl. ¶ 6.

2001). The agency asserting a FOIA exemption "bears the burden of proof," if there is any doubt about the applicability of an exemption, it must be resolved in favor of disclosure. *Wilner v. Nat'l Sec. Agency*, 592 F.3d 60, 69 (2d Cir. 2009); *Rose v. Dep't of the Air Force*, 495 F.2d 261, 268 (2d Cir. 1974), *aff'd*, 425 U.S. 352 (1976) (same). To surmount that burden on summary judgment, "an agency must demonstrate 'that each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements.'" *Ruotolo v. Dep't of Justice, Tax Div.*, 53 F.3d 4, 9 (2d Cir. 1995).

In addition to affidavits, an agency generally submits a *Vaughn* index to support its claim to an Exemption. *Nat'l Day Laborer Org. Network v. U.S. Immigration & Customs Enforcement Agency*, 811 F. Supp. 2d 713, 733 (S.D.N.Y. 2011), amended on reconsideration (Aug. 8, 2011). A *Vaughn*[2] index is "an itemized listing of the non-disclosed records, describing each record and ... providing a detailed justification for the agency's withholding," *id.*, whose purpose is to "(a) permit the opposing party to contest the affidavit in an adversarial fashion, and to (b) permit a reviewing court to engage in effective *de novo* review." *Id.* (internal quotation marks and alterations omitted). NARA has not submitted a *Vaughn* index in this case.

## ARGUMENT

## I. NARA BEARS A HEAVY BURDEN UNDER FOIA EXEMPTION 6 TO JUSTIFY WITHHOLDING THE RECORDS

### A. FOIA Mandates a Strong Presumption of Access to Government Records

FOIA was enacted to "promote honest and open government and to assure the existence of an informed citizenry to hold the governors accountable to the governed." *Grand Central P'ship, Inc. v. Cuomo*, 166 F.3d 473, 478 (2d Cir. 1999) (internal quotation marks and citation omitted). Reflecting a policy of disclosure, *Halpern v. FBI*, 181 F.3d 279, 286 (2d Cir. 1999), "'the Act is

---

[2] *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973).

broadly conceived. It seeks to permit access to official information long shielded unnecessarily from public view and attempts to create a judicially enforceable public right to secure such information from possibly unwilling official hands.'" *Dep't of the Air Force v. Rose*, 425 U.S. 352, 361 (1976) (quoting *EPA v. Mink*, 410 U.S. 73, 80 (1973)).

FOIA requires a government agency to disclose any records requested unless they fall within one of the nine specific statutory exemptions listed in § 552(b), which "have been consistently given a narrow compass." *See U.S. Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989); *Wood v. FBI*, 432 F.3d 78, 83 (2d Cir. 2005) (Sotomayor, J.) (same).

### B. Exemption 6 Is Particularly Narrow

Exemption 6 empowers agencies to withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). The Government "must show *both* that the material sought qualifies as a personnel, medical, or similar file *and* that disclosure would constitute a 'clearly unwarranted invasion of personal privacy.'" *Ditlow v. Shultz,* 517 F.2d 166, 169 (D.C. Cir. 1975) (emphasis added). If the information sought is not contained in a personnel, medical, or similar file, the Court must stop there and need not engage in balancing. *Families for Freedom v. U.S. Customs & Border Prot.*, 10 CIV. 2705 (SAS), 2011 WL 6780896 (S.D.N.Y. Dec. 27, 2011); *Nat'l Day Laborer Org. Network,* 811 F. Supp. 2d at 744 ("[T]he threshold issue is whether the documents in question constitute the types of records ... [Exemption 6 is] intended to protect.").

If the documents qualify as personnel, medical, or similar files, the next step is to determine whether disclosure "compromise[s] *substantial* privacy interests." Aguirre v. S.E.C., 551 F. Supp. 2d 33, 53 (D.D.C. 2008) (quoting *Ripskis v. Dep't of Hous. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984)). The inquiry ends if substantial privacy interests are not compromised. *Id.* If a substantial

privacy interest is at stake, the Court must balance "the potential harm to privacy interests" against "the public interest in disclosure of the requested information," deciding whether the balance is so severe that the privacy impact is "clearly unwarranted." *Id.* at 53. The relevant public interest is "the extent to which disclosure of the information sought would she[d] light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to." *Wood v. F.B.I.*, 432 F.3d 78, 88 (2d Cir. 2005).

To bar disclosure, the Court must determine that disclosure "*would* constitute a *clearly* unwarranted invasion of personal privacy." *Aguirre*, 551 F. Supp. at 55 (quoting 5 U.S.C. § 552(b)(6)). This standard is more exacting than that for Exemption 7(C), which requires an agency to show only that disclosure "*could reasonably* be expected to constitute an unwarranted invasion of personal privacy." *Id.* (quoting 5 U.S.C. § 552(b)(7)); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 165-66 (2004) (In "marked contrast" to Exemption 6, "[t]he adverb 'clearly,' . . . is not used in Exemption 7(C)"); *U.S. Dep't of State v. Ray*, 502 U.S. 164 (1991) ("[T]he Government's burden in establishing the requisite invasion of privacy to support an Exemption 6 claim is heavier than the standard applicable to Exemption 7(C)").[3]

The "clearly unwarranted invasion of personal privacy" language expresses "a carefully considered congressional policy favoring disclosure," which "instructs the court to tilt the balance in favor of disclosure." *Ditlow v. Shultz*, 517 F.2d 166, 169 (D.C. Cir. 1975); *see also News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1197-1202 (11th Cir. 2007) (discussing the legislative history of Exemption 6, which indicates "a carefully considered congressional policy favoring

---

[3] Notwithstanding the clear distinction between the standards of exemptions 6 and 7 as reflected in FOIA's text and applicable case law, NARA inexplicably and repeatedly relies on Exemption 7(C) cases to support its argument that the Government faces a low bar to succeed on its Exemption 6 claim. *See, e.g.*, Defendant's Brief at 19-21 (citing Hopkins v. HUD, 929 F.2d 81, 88 (2d Cir. 1991); *U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 774 (1989). But NARA's reliance on the Exemption 7(C) cases obscures the meaningful difference in the standards under the two exemptions and fails candidly to advise the court that the Government can only prevail in this case if it shows that the infringement on the privacy of the former officials and their representatives is "clearly unwarranted." *See* Section II.C, *infra*.

disclosure") (internal quotation marks omitted).

## II. NARA HAS FAILED TO CARRY ITS BURDEN UNDER EXEMPTION 6

### A. Records of special access requests are not personnel, medical, or similar files and therefore are not exempt from FOIA disclosure requirements.

The records of special access requests Mr. Cook seeks are not personnel, medical, or similar files. *See Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 744 ("Before examining the balance of privacy and public interests, the threshold issue is whether the documents in question constitute the types of records . . . [Exemption 6 is] intended to protect."); *see also Wood v. F.B.I.*, 432 F.3d 78, 86 (2d Cir. 2005). In considering whether the information is contained in a file "similar" to a personnel or medical file, a court must ask "whether the records at issue are likely to contain the *type of personal information* that would be in a medical or personnel file." *Wood*, 432 F.3d at 87 (emphasis added). If information does not meet this threshold inquiry, the Court must stop there and need not perform the balancing test. *Families for Freedom v. U.S. Customs & Border Prot.*, 10 CIV. 2705 (SAS), 2011 WL 6780896 (S.D.N.Y. Dec. 27, 2011) (holding that "[t]here is no need to go to the second step and balance the public's interest in disclosure against the privacy interests" because the files at issue fail to meet the test for "similar files").

The special access requests do not survive this threshold inquiry, and this Court should mandate disclosure without proceeding to the search for a substantial privacy interest. In *U.S. Dep't of State v. Washington Post Co.*, the Supreme Court explained that "[E]xemption [6 was] intended to cover *detailed* Government records on an individual which can be identified as applying to that individual." 456 U.S. 595, 602 (1982) (emphasis added) (citation omitted). Courts have consistently respected the limits embodied in the text of Exemption 6, rejecting an expansive interpretation of the phrase "similar files." In *Families for Freedom*, for example, the Government redacted intra-agency emails that contained the sender's name, position, department, phone number, and e-mail

address, but the court mandated disclosure because it found that the e-mails were "nothing like personnel or medical files." 2011 WL 6780896, at *9. The court noted that "[b]oth the plain meaning of the statute and the Second Circuit's method of applying it make clear that Exemption 6 applies only to personnel and medical files and to similar files, such as those containing investigations of alleged corruption, passport applications, asylum requests, or detainee abuse." *Id.*

Similarly, in *Nat'l Day Laborer Org. Network,* the court emphasized that judges should not "interpret[] . . . *Washington Post* so broadly as to render the threshold inquiry meaningless." 811 F. Supp. 2d at 745. "The inquiry in this jurisdiction is 'whether the records at issue are likely to contain the type of personal information that would be in a medical or personnel file," and according to the court:

> Such information generally includes "'place of birth, date of birth, date of marriage, employment history,'" and other "identifying information," though not necessarily "intimate" information. Examples of records that would fall into the "similar files" category include administrative investigation files, which could contain personal information about the subject of the investigation and about third-party witnesses; "files [that] would contain . . . the information that normally is required from a passport applicant;" or "[a]ttachments to an individual's asylum request consisting of personal history data and supporting affidavits."

*Id.* at 745-46 (internal citations omitted).

The records at issue here—requests by (or for) the former President and Vice President for official records of their Administration—are not "personnel" or "similar" files under Exemption 6. Far from containing the type of information about the former officials that would be found in a medical or personnel file, or from meeting the *Washington Post* standard of "detailed Government records on an individual," they are instead similar to the "mundane interoffice communications" that were disclosable in *Families for Freedom.*

This analysis applies *a fortiori* to the names of the former officials' *designees*. "[I]nformation that 'merely identifies the names of government officials who authored documents

and received documents' does not generally fall within Exemption 6." *Nat'l Day Laborer Org. Network*, 811 F. Supp. 2d at 737 (citation omitted); *see also VoteHemp, Inc. v. Drug Enforcement Admin.*, 567 F. Supp. 2d 1, 15 (D.D.C. 2004) (names of DEA employees do not constitute similar files under Exemption 6). Thus, the Government cannot protect the names of the former officials' designees from disclosure under Exemption 6.

Because the information Mr. Cook seeks fails this threshold test, Exemption 6 is inapplicable to special access requests made to NARA for Presidential records.

## B. There is No Substantial Privacy Interest in the Special Access Requests of the Former Officials or Their Representatives

Even if the documents at issue here are "personnel" or "similar" files, NARA must show that disclosure "compromise[s] substantial privacy interests" before a court will move to the balancing test. *Aguirre*, 551 F. Supp. at 53 (citation omitted). The inquiry ends if *substantial* privacy interests are not compromised. *Id.* To be substantial, a privacy interest must be more than *de minimis*. *See Associated Press v. U.S. Dep't of Def.*, 554 F.3d 274, 285 (2d Cir. 2009) ("Thus, 'once a more than *de minimis* privacy interest is implicated the competing interests at stake must be balanced in order to decide whether disclosure is permitted under FOIA.'") (citing *FLRA v. U.S. Dep't of Veterans Affairs*, 958 F.2d 503, 510 (2d Cir. 1992)). The Government has made no such showing here.

### 1. The Former Officials' Designees Have No More Than a *De Minimis* Privacy Interest in Their Requests

As a preliminary matter, it is important to note that NARA has conflated two distinct legal claims. NARA spends virtually its entire brief discussing the privacy interests of the former President and Vice President. It also makes passing reference to the privacy interests of their designees, but nothing in NARA's argument or the case law suggests that the designees have a

substantial privacy interest in their special access requests. Indeed, Exemption 6 "'disfavors privacy claims by those who,' like the designees, have "receive[d] a governmental benefit.'" *News-Press*, 489 F.3d at 1202 (internal citation omitted). When individuals affirmatively and voluntarily choose to interact with the government, their privacy interests are minimal. *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 306 (D.D.C. 2007) (holding that disclosure of "the mere identity of individuals who voluntarily" petition the government to take some action "does not raise the kind of privacy concerns protected by Exemption 6"). Because the designees have voluntarily availed themselves of the benefits of NARA's documents, they have no substantial privacy interest in their dealings with the agency.

Moreover, while NARA's brief asserts a privacy interest in the substance of the requests, NARA has failed to assert any privacy interest in the designees' names. "[W]hether the disclosure of names . . . threatens a significant privacy interest depends on the consequences likely to ensue from disclosure." *Wood*, 432 F.3d at 88 (citation omitted)). For a privacy interest to exist, the disclosure of names and or other identifying information must "subject the person to harassment, disgrace, loss of employment, or friends." *American Fed'n of Gov't Employees, Local 1760 v. Fed. Labor Relations Auth.*, 786 F.2d 554, 556 (2d Cir. 1986) (citing *Brown v. Fed. Bureau of Investigation*, 658 F.2d 71, 75 (2d Cir. 1981)). NARA has not pointed to any evidence that the designees would be subject to such harassment simply because they are known to have collected Presidential documents. There is no basis, other than the hearsay allegations of a government officer (not any of the designees), *see* Robison Decl., for the conclusory assertion that disclosure of the identities of the designees would subject them to undesired public scrutiny or harassment.

## 2. NARA Mischaracterizes Congress's Limited Concern for the Privacy of Former Presidents and Vice Presidents.

The PRA itself, 44 USC §§ 2201-07, requires nothing more than the traditional Exemption 6

analysis. Both its text and its legislative history show a clear congressional preference for the public interest in disclosure of government documents over any purported personal privacy interests of former officials or their designees.

Enacted by Congress in 1978, the PRA's primary goals were to ensure public ownership of and access to presidential papers and to establish procedures to govern the preservation and public availability of those records. Prior to enactment, the security of presidential documents depended on the former executive officials voluntarily donating them, usually to their presidential libraries, after they stepped down from office. Through the PRA, Congress sought to rectify this precarious situation. *See* H.R. REP. NO. 95-1487, at 5-6 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5732, 5733.

The importance of declaring presidential documents to be public property was "the one [issue] on which all of the witnesses were in agreement" at the House hearings on the proposed act. *Id.* at 7; *see generally The Disposition and Preservation of Documents of Federal Officials: Hearing on H.R. 16902 and Related Legislation Before the Subcomm. on Printing of the H. Comm. on H. Admin.*, 93d Cong. 78-79 (1974) (statement of John Eisenhower, former ambassador to Belgium) (hereinafter "Eisenhower Statement") ("I do not see, logically, why Presidential papers should be considered personal property. They should be considered governmental papers."); *To Amend the Freedom of Information Act to Insure Public Access to the Official Papers of the President, and for Other Purposes: Hearing on H.R. 10998 Before the Subcomm. On Gov't Information and Individual Rights of the H. Comm. on Gov't Operations*, 95th Cong. 253 (1978) [hereinafter *House Hearing*] (statement of Richard Kirkendall, Executive Secretary, Organization of American Historians) ("Congress should . . . declar[e] some [presidential papers] to be public property and others to be subject to public regulation and requir[e] that all should be governed by a bias in favor of early and equal access.").

13

Congress opted for the public interest in disclosure over the purported privacy interests of former presidents in every instance in which the two ideals conflicted, with the exception of purely personal papers.[4] *See Nixon v. Adm'r of Gen. Services*, 433 U.S. 425, 484 (1977). The House Report on the proposed PRA notes that "the volume of truly personal material is considered miniscule" because "a great number of what might ordinarily be construed as one's private activities are, because of the nature of the presidency, considered to be of a public nature." H.R. REP. NO. 95-1487, at 11-12.

Congress established a five-year period of restricted access between the end of a presidential administration and public availability of presidential documents not for the sake of the former executives, but rather to ensure that the records administrators would have time to "arrange, screen, describe and process the huge set of records turned over." *Id.* at 9. Archivists were concerned that immediate public access would result in so many document requests as to hamper the archival process. *See House Hearing* at 136 (statement of James B. Rhoads, archivist of the United States). The former officials retained access to the documents because they created the documents, not because they had any property or privacy interest in them.

Even where the PRA recognizes a presidential privilege, the privilege was created for the sake of the public and had nothing to do with the personal privacy of the former officials. The Act gives a president and vice president the privilege of controlling access to documents that they categorize as protected for a period of up to 12 years after they leave office, 44 U.S.C. § 2204, to prevent a "'chilling effect' on presidents and the frankness of advice they could expect from their

---

[4] It is important to note, further, that any concern for presidential privacy concerned the actual documents at issue, not any requests for documents. The PRA provides for the documents themselves to be kept out of the public's hands for five to twelve years, not for any such protection for requests by or on behalf of former officials. The history of the Act does not suggest any desire to prevent the public from knowing that former officials (and their designees) are *involved* in research using such documents or *what subjects* the research covers.

staffs." H.R. REP. NO. 95-1487 at 8. The "privilege is necessary to provide the confidentiality required for the President's conduct of office" and was "not for the benefit of the President as an individual, but for the benefit of the Republic." *Nixon*, 433 U.S. at 449.

### 3. There Is At Most a *De Minimis* Privacy Interest in the Research Requests Made by Former Officials to a Federal Agency for Public Documents

The former President and Vice President share the characteristics of public officials; they are not private persons insofar as they (directly or through designees) seek public documents from their time in office. Not only are they granted special access privileges to the documents they generated while in office, but they also receive numerous taxpayer-funded privileges by virtue of their status as former officials. There is, at most, a *de minimis* privacy interest in their requests for access to documents from their time in office.

The former officials have relationships with NARA that are clearly distinct from those normal private citizens have with the agency. They may access documents from their time in office five years before the general public, they may designate certain documents to be withheld from the public for up to 12 years, and they may allow early access to other individuals whom they designate as their representatives. Additionally, former executive officials receive numerous taxpayer-funded privileges that distinguish them from normal private citizens. The Former Presidents Act, 3 U.S.C. § 102 (2006), directs the U.S. Secretary of the Treasury to pay each former President an annual salary. The Administrator of General Services provides office space, including furnishings, for each former President "at such place within the United States as the former President shall specify" and pays the salaries of the former President's office staff. Additionally, former Presidents and Vice Presidents are granted either lifetime protection by the U.S. Secret Service or up to $1.5 million annually "for security and travel-related expenses" from the Administrator of General Services. *Id.*

Such privileges have led courts to note that even after leaving office, "former Presidents are

still part of the government in many ways." *Nat'l Inst. Of Military Justice v. United States Dep't of Def.*, 512 F.3d 677, 690 (D.C. Cir. 2008). A former President "can hardly be viewed as an ordinary private citizen. He retains aspects of his former role [including] the authority to assert the executive privilege regarding Presidential communications." *Public Citizen, Inc. v. Dep't of Justice*, 111 F.3d 168, 170 (D.C. Cir. 1997). Former presidents enjoy a status and a relationship with government agencies, and with NARA in particular, that differ from those of ordinary private citizens and form the necessary context in which to consider the contention that disclosure of their requests would be a "clearly unwarranted" invasion of "personal privacy."

### 4. There Is No Substantial Privacy Interest In the Special Access Requests Even If the Former Officials Are Considered Private Citizens.

Moreover, even if the former officials are considered private citizens, and assuming *arguendo* that the special access requests can be considered "files" "about" the officials, those determinations would not warrant withholding the documents Mr. Cook seeks. Where FOIA requests have sought information about private citizens, the courts have looked to whether the information sought is such that publicly associating the individual with a particular program or activity would reveal anything stigmatizing or intimate about the individual. *See News-Press v. U.S. Dep't of Homeland Sec.*, 489 F.3d 1173, 1200-02 (11th Cir. 2007).

Courts have discerned a meaningful difference between disclosure of information about individuals that is part and parcel of information about what the government is "up to" and disclosure that simply opens a window onto "an individual's private affairs." *See Rose*, 425 U.S. at 372. Disclosure of the special access requests is an example of the former. The procurement of a government benefit such as is provided by special access to NARA's records is not the sort of "private affair" that Exemption 6 is designed to protect. *See Ray*, 502 U.S. at 174 n.10 (quoting S. Rep. No. 813, 89th Cong., 1st Sess., 7 (1965) (Exemption 6 concerns "the private citizen's right to

be secure in *his personal affairs which have no bearing or effect on the general public*" (emphasis added)). Much like the documents of an academic who takes advantage of a federal grant, the former officials' requests are important to—that is, they "have [a] bearing [and] effect on"—the general public. *Cf.* OMB Circular A-110, *Uniform Administrative Requirements for Grants and Agreements With Institutions of Higher Education, Hospitals, and Other Non-Profit Organizations,* § 36(d)(1) (Sep. 30, 1999) (requiring that federal agencies make available federal grant applications and underlying data submitted to the agency).

The Government's asserted analogy between the special access requests and library loan information is unavailing for multiple reasons. First, requests for public records by the former President and Vice President are simply not akin to the research requests of private researchers at libraries, because the former officials are not using NARA in the same way private people— scholars and regular citizens alike—use libraries. The former officials' requests concern documents that were created under the watch of the taxpayer and are by definition publicly owned, *see* PRA, 44 U.S.C. § 2202, and federal law facilitates (and funds) those requests by granting the former officials and their designees special, early access to the documents. The same cannot be said of the run-of-the-mill library records of private citizens.[5]

Second, the alleged subjective "expectation of privacy" of the former officials and their designees is not relevant to the Exemption 6 analysis. The unsupported assertions of NARA employees have no bearing on whether there is a substantial privacy interest in the documents at issue here. *See Miami Herald Pub. Co. v. U.S. Small Bus. Admin.*, 670 F.2d 610, 615-16 (5th Cir. 1982) ("[T]he SBA conceded that the expectation of such an accommodation is a mere hope on the part of the borrower, with no foundation in statute or in SBA loan documents. . . . Congress cannot

---

[5] Nor is there any special privacy interest related to information about academic research plans. Indeed, none of the reasons courts have offered for preventing disclosure of academic research documents applies to the names of the designees, which are in no sense private.

have intended the personal or confidential nature of information within exemption 6 to be determined by the whim of officers of the agency invoking the exemption.").

Moreover, even if those expectations of privacy were relevant, nothing about NARA's request procedure gives the former officials or their designees such a reasonable expectation of privacy in the mere fact that they have sought certain records. NARA's internal rules do not suggest that such requests will be confidential. NARA's provisions for researcher sign-out forms are not legally required and have nothing to do with researcher privacy. They are meant simply to streamline the process. *See* Robison Decl. ¶¶ 21-22. Moreover, NARA updated its sign-out form after the instant litigation began to include more information pertaining to the privacy of the requester. *See id.* at ¶ 22. The agency has not asserted that *any* confidential sign-out forms were used in the context of the special access requests at issue here—much less a form with enhanced privacy protections—and so it cannot plausibly assert that the use of such forms created a reasonable expectation of privacy in those special access requests.

Nor is there any competent declaration establishing that the officials or designees involved actually believed the fact or contents of such requests to be confidential, and the unsupported hearsay evidence of two NARA officials presented in the Government's brief does not change that fact. *See* Robison Decl.[6]; *see also News-Press*, 489 F.3d at 1203 (rejecting FEMA's argument that its policies give beneficiaries an expectation of privacy). To the contrary, the courts have placed no weight on such unsupported agency assertions. *See Sims v. CIA*, 642 F.2d 562, 575 (D.C. Cir. 1980) (where the district court was uncertain that there was a substantial privacy interest at stake, it invited

---

[6] Throughout its brief, NARA implies that the Privacy Act of 1974, 5 U.S.C. § 552(a) somehow supports its position. Def.'s Br. At 5-6, 12; Mills Decl. ¶ 10. It does not; the Act exempts disclosures "required under section 552 of this title. " 5 U.S.C. § 522a(b)(2). Thus, the Privacy Act expressly does not forbid disclosure that FOIA requires. *See News-Press v. DHS*, 489 F.3d 1173, 1189 (11th Cir. 2007) ("[W]here the FOIA requires disclosure, the Privacy Act will not stand in its way"); *Greentree v. U.S. Customs Serv.*, 674 F.2d 74, 79 (D.C. Cir. 1982) (subsection (b)(2) "represents a Congressional mandate that the Privacy Act not be used as a barrier to FOIA access").

inquiry with individual researchers to permit such assessment). Similarly, in *War Babes v. Wilson*, 770 F. Supp. 1, 4-5 (D.D.C. 1990), a court rejected NARA's attempt to assert a privacy interest on behalf of a third party, noting that "NARA may be the repository of the information, but in asserting a privacy interest against disclosure, it acts only as fiduciary, not as principal. . . . [N]owhere in this record is it shown that NARA is acting in accordance with the wishes of any of its beneficiaries." The court emphasized that it could not presume a privacy interest "in the absence of proof" from the party whose privacy was asserted to be infringed, and it placed the burden on NARA to offer evidence that the servicemen themselves had a privacy interest. That same reasoning precludes NARA from relying on a privacy interest of a small group of individuals without having submitted affidavits from those allegedly affected individuals. Like the agency in *Sims*, NARA "has failed to particularize their objections to disclosure or to establish the likely consequences of disclosure in individual cases." 642 F.2d at 575.

### 5. Disclosure Would Accord with Congress's Policy Choices

During the PRA hearings, only two witnesses (of the several dozen who testified) argued to Congress that former presidents should be encouraged to write their memoirs. Neither they nor anyone else, however, suggested that confidentiality of research requests and application of a FOIA exemption were necessary to encourage former presidents to provide the public with their thoughts. Eisenhower Statement at 77 ("I feel a President has a certain obligation to write his memoirs. . . . In order to write such memoirs effectively, he should have selected Presidential papers available for reference."). Nothing in the text or legislative history of the statute suggests that Congress considered granting confidentiality to PRA requests in order to induce presidents to write memoirs.

Moreover, there is no connection between disclosure of the special access requests—as opposed to the underlying documents—and a chilling effect on presidential memoirs, NARA's

conclusory assertions to the contrary notwithstanding. *See* Def.'s Br. in Supp. of Mot. for Summ. J. 18. Disclosing the mere fact of a former president's research will not chill such writing when the subjects of that research, not to mention the documents themselves, will be available to the public at the end of the PRA's exclusivity term. Unlike disclosure of unpublished academic grant proposals or data, which could point competing scholars to a researcher's topic or allow them to get a "scoop," no one but the former president can write that president's memoirs, and even if Mr. Cook's request were granted, the underlying documents would remain private during the initial period of restricted access, so the former officials and their designees would retain the statutory exclusivity period in which to complete their work based on those documents.[7]

In short, NARA cannot show that disclosure of the contents of the special access requests implicates more than a *de minimis* privacy interest. Accordingly, no balancing of the public interest in disclosure is required, and Mr. Cook is entitled to summary judgment.

### C. Any Privacy Interest Is Outweighed by the Legitimate Public Interest in Understanding NARA's Implementation of the PRA

Even if the Court were to find that NARA has shown that the former officials and their designees have a substantial privacy interest, Mr. Cook would be entitled to summary judgment because as a matter of law the public interest in disclosure outweighs any pertinent privacy concerns. *See Multi AG Media v. Department of Agriculture*, 515 F.3d 1224, 1230 (D.C. Cir. 2008) ("Finding a substantial privacy interest does not conclude the inquiry . . . . [A] privacy interest may be substantial . . . and yet be insufficient to overcome the public interest in disclosure."). Under Exemption 6, the government agency faces the significant burden of showing not merely that a "personal privacy" interest could be invaded, but that disclosure would constitute a "clearly

---

[7] Similarly, nothing in the record establishes that disclosure of the names or the substance of the requests of the former officials' designees would prevent the former officials (or their designees) from carrying out research that would otherwise be conducted.

unwarranted" invasion. *Department of Air Force v. Rose*, 425 U.S. 352, 382 (1976). In assessing the public interest in disclosure, courts must consider "the extent to which disclosure would serve the core purpose of FOIA, which is contributing significantly to public understanding of the operations or activities of government." *U.S. Dep't of Defense v. FLR*, 510 U.S. 487, 495 (1994) (internal quotation marks and alterations omitted). Because citizens have a "right to be informed about what their government is up to," *U.S. Dep't of Justice v. Reporters Comm. For Freedom of the Press*, 489 U.S. 749, 772 (1989) (internal quotation marks omitted), even a significant privacy interest is overcome when disclosure will shed light on agency action. *See Hopkins v. U.S. Dep't of Hous. and Urban Dev.*, 929 F.2d 81, 87 (2d Cir. 1991) (noting that "the public interest in disclosure . . . must be measured in terms of the relationship of that document to the FOIA's central purpose – to open agency action to the light of public scrutiny" (internal quotation marks omitted)).

Disclosing records of special access requests "serve[s] the core purpose of the FOIA." *FLRA*, 510 U.S. at 495. Disclosure would illuminate the operations and activities of NARA in its implementation of the PRA. The PRA sets up a complex statutory scheme that affords the former officials (and their designees) special access to public records for a limited time, and NARA plays an essential role by facilitating that access. *See* Robison Decl. ¶¶ 8-19. NARA's procedures are critical to determining to whom those benefits are afforded. Understanding the process by which requests are evaluated and granted or denied enables citizens to "be informed about what their government is up to." *Reporters Comm.*, 489 U.S. at 773 (internal quotation marks omitted); *see also* Cook Decl. ¶¶ 8-9 ("My FOIA request would serve the public interest by shedding light on NARA's implementation of the PRA. . . . [L]ittle is known about NARA's role in facilitating access during the restricted five-year period.").

Even where the relevant privacy interest has been far more significant, courts have still

recognized that disclosure of identifying information empowers the public to monitor how effectively the government has administered an agency program. In *News-Press v. U.S. Department of Homeland Security*, the court granted several newspapers access to the addresses of those people who had been impacted by natural disasters and had applied for disaster relief funds. 489 F.3d at 1205. The court reasoned that the public could better monitor FEMA's disbursement of those funds with access to the records. *Id.* at 1202. In *Baltimore Sun v. U.S. Marshals Serv.*, which addressed a newspaper's request for information on property seizures, the court noted that "[a]ccess to the names and addresses at issue would enable the public to assess law enforcement agencies' exercise of the substantial government power to seize property." 131 F. Supp. 2d 725, 729 (D. Md. 2001). "[O]btaining information to act as a 'watchdog' of the government is a well-recognized public interest in the FOIA context." *Id.* at 729-30. Similarly, access to the special access requests (including the identities of the requesters and the description of the records sought) would enable the public to assess the scope of activities being funded by taxpayer money and the nature and extent of NARA's involvement in the shaping of the legacies of President Bush and Vice President Cheney. *See* Cook Decl. ¶¶ 8-10 ("I am attempting to gain insight into the role that NARA plays in administering . . . the PRA and thereby helping the former President and Vice President shape the public's perception of their time in office.").

The Government argues that disclosure would serve no public interest, pointing to Mr. Cook's acknowledged interest in how the "former President and Vice President have chosen to shape the public's perception of their time in office," Compl. at ¶ 5, but just because a FOIA requester is interested in the activities of an individual or set of individuals does not mean that there is not also a public interest involved in the request. To the contrary, the relevant records "may still be cloaked with the public interest if [they] shed light on agency action." *Citizens for Responsibility*

*& Ethics in Washington v. U.S. Dep't of Justice*, CIV.A. 11-1021 JEB, 2012 WL 692048 (D.D.C. Mar. 2, 2012) ("[T]he mere fact that records pertain to an individual's activities" does not necessarily mean that there is no cognizable public interest in their disclosure.). Mr. Cook seeks to understand both how the former officials have chosen to shape public perception and NARA's role in facilitating that process. *See* Cook Decl. ¶¶ 8-10. In *Citizens for Responsibility & Ethics in Washington v. U.S. Dep't of Justice*, the court held that the plaintiff's purpose in exposing "alleged malfeasance and possible criminal behavior by Rep. Lewis" did not negate the public interest in shedding light on "the conduct of DOJ and the FBI in conducting the investigation of Rep. Lewis." 2012 WL 692048, at *1, *7. In any event, as the court recognized in *Associated Press v. U.S. Dep't of Defense*, "the public interest 'cannot turn on the purposes for which the request for information is made.'" 554 F.3d 274, 285 (2009) (quoting *Reporters Comm.*, 489 U.S. at 771, 109 S.Ct. 1468).

Moreover, in this case the former officials are tantamount to government actors. They are only involved with the particular documents NARA holds because of their former positions. *See* Section II.B.3. Thus, contrary to the Government's narrow vision of the relevant interests, shedding light on the former officials' activities is also a permissible—and compelling—public interest. *See* Cook Decl. ¶ 10 ("[M]y request would shed light on how the former President and Vice President are using this exclusive access to shape the public's perception of their time in office. . . . Disclosure of the special access requests would reveal to whom the former [officials] have chosen to grant this advantage, and the subject matter of the records they felt most interested in revisiting . . . . This is a matter of interest for my readers as well as the broader public.").

Cases holding that the requester could not allege sufficient public interest involved a far less direct link between the relevant documents and the asserted public interest. *See, e.g.*, *National Ass'n of Retired Federal Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989) (rejecting plaintiff's

assertion of a public interest in disclosure of annuitants' names and addresses, where plaintiff claimed that disclosure would aid its lobbying efforts "and thus result in the passage of laws that would benefit the public"); *Hertzberg v. Veneman*, 273 F. Supp. 2d 67 (D.D.C 2003). For example, in *Hertzberg v. Veneman*, the plaintiff sought the identities of witnesses interviewed as part of the USDA's investigation of wildfire suppression efforts, claiming that obtaining the identities of the witnesses would allow the plaintiff to re-interview the witnesses and obtain additional information, but the Court disagreed, arguing that the link to the public interest was too attenuated. *Id.* at 86-87. In this case, Mr. Cook is not arguing that the public interest would be served by interviewing the designated representatives, but rather that the public interest would be served by disclosing NARA's role in this particular provision of the PRA. *See* Cook Decl. ¶¶ 8-10. Disclosure of the requests here would directly affect the core public interest of FOIA by contributing to the public's understanding of NARA's role in facilitating the access of the former officials and their designees. The Government misconstrued the public interest involved in the disclosure of these records by focusing on the "policy-oriented information [that] could be gleaned from the fact that the former officials sought or obtained certain information from their official records," *see* Def.'s Br. at 21, when the relevant consideration is NARA's role in facilitating the access to those official records, and the extent of the former official's use of those privileges.

Similarly, the Court should distinguish this case from those the Government cites in its brief. *Associated Press v. U.S. Dep't of Def*, 554 F.3d 274 (2009), is inapt, for example, because the public interest in disclosure of the special access requests is not "speculative." In *Associated Press*, the plaintiff argued that disclosure of the identities of Guantanamo detainees that had allegedly been mistreated would allow the public to evaluate their treatment during various administrative procedures. *Id.* at 289-90. However, it was entirely possible that disclosure would reveal no relevant

pattern related to how the detainees had been treated during administrative procedures. *Id.* In contrast, Mr. Cook is not attempting to identify a particular pattern that may or may not exist. Disclosure of the special access requests would shed light on NARA's implementation of the PRA and thus directly benefit the public. Cook Decl. ¶¶ 8-10.

Finally, the Government's argument that Congress already determined how to balance the private and public interests in this case is flawed and does not justify withholding. *See* Def.'s Br. at 22. To the extent that Congress weighed the private interest against the public interest in passing the PRA, its focus was on the Presidential records themselves and not on disclosure of the special access requests.

In sum, even if the Court agrees with the Government's argument that a privacy interest exists, any privacy interest of former officials and their designees in their requests for special access to taxpayer-funder repositories of official government documents pales against the public interest reflected in Mr. Cook's request.

## CONCLUSION

For these reasons, the Court should deny NARA's Motion for Summary Judgment and grant Mr. Cook's Cross-Motion.

Dated: New York, New York
May 1, 2012

Respectfully submitted,

CHARLES SIMS
Partner
Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
E-mail: csims@proskauer.com
Telephone: (212) 969-3950
Facsimile: (212) 969-2900